**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| HECTOR NAVARRO; MIKE SHIRINIAN; ANTHONY PINKINS; KEVIN MALONE; REUBEN CASTRO, *Plaintiffs-Appellants*, <br><br> v. <br><br> ENCINO MOTORCARS, LLC, erroneously sued as Mercedes Benz of Encino, *Defendant-Appellee.* | No. 13-55323 <br><br> D.C. No. 2:12-cv-08051-RGK-MRW <br><br><br> OPINION |

On Remand from the
Supreme Court of the United States

Filed January 9, 2017

Before:  Susan P. Graber and Kim McLane Wardlaw,
Circuit Judges, and James C. Mahan,[*] District Judge.

Opinion by Judge Graber

---

[*] The Honorable James C. Mahan, United States District Judge for the District of Nevada, sitting by designation.

## SUMMARY[**]

### Labor Law

On remand from the Supreme Court, the panel affirmed in part and reversed in part the district court's dismissal of an action brought under the Fair Labor Standards Act against an automobile dealership.

Reversing the dismissal of a federal claim for overtime compensation, and disagreeing with the Fourth and Fifth Circuits, the panel held that service advisors do not fall within an exemption from the FLSA's overtime-compensation requirement for "any salesman, partsman, or mechanic primarily engaged in . . . servicing automobiles." Assuming without deciding that it must give no weight to the Secretary of Labor's interpretation, the panel interpreted 29 U.S.C. § 213(b)(10)(A) in the first instance.

For the reasons given in an earlier opinion, the panel affirmed the dismissal of plaintiffs' other federal claims and reversed the dismissal of state-law claims. The panel remanded the case to the district court.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

S. Keven Steinberg (argued), Thompson Coe & O'Meara, Los Angeles, California; Nancy Bregstein Gordon, James A. Feldman, and Stephanos Bibas, University of Pennsylvania Law School Supreme Court Clinic, Philadelphia, Pennsylvania; for Plaintiffs-Appellants.

Todd B. Scherwin (argued), Karl R. Lindegren, and Colin P. Calvert, Fisher & Phillips LLP, Irvine, California; Wendy McGuire Coats, Fisher & Phillips LLP, San Francisco, California; for Defendant-Appellee.

Felicia R. Reid, Hirschfeld Kraemer LLP, San Francisco, California; Douglas I. Greenhaus, National Automobile Dealers Association, McLean, Virginia; for Amici Curiae National Automobile Dealers Association and State Automobile Dealers Associations for Alaska, Arizona, California, Hawaii, Idaho, Montana, Nevada, Oregon, and Washington State.

Melissa A. Murphy and Laura M. Moskowitz, Senior Attorneys; Paul L. Frieden, Counsel for Appellate Litigation; Jennifer S. Brand, Associate Solicitor; M. Patricia Smith, Solicitor of Labor; Office of the Solicitor, United States Department of Labor, Washington, D.C.; for Amicus Curiae Secretary of Labor.

**OPINION**

GRABER, Circuit Judge:

On remand from the Supreme Court, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), we must consider anew whether the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, requires automobile dealerships to pay overtime compensation to service advisors. The district court held that service advisors fall within the exemption from the overtime-compensation requirement for "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles," *id.* § 213(b)(10)(A), on the ground that a service advisor is a "salesman . . . primarily engaged in . . . servicing automobiles." Because we conclude that Congress did not intend for the exemption to encompass service advisors, we reverse and remand for further proceedings.

FACTUAL AND PROCEDURAL HISTORY

Defendant Encino Motorcars, LLC, sells and services new and used Mercedes-Benz automobiles.[1] Defendant employed or employs Plaintiffs Hector Navarro, Mike Shirinian, Anthony Pinkins, Kevin Malone, and Reuben Castro as "service advisors." Plaintiffs greet Mercedes-Benz owners as they arrive in the service area of the dealership; listen to customers' concerns about their cars; evaluate the repair and maintenance needs of the cars; suggest services to be performed to remedy the customers' concerns; suggest

---

[1] Because the district court dismissed this case under Federal Rule of Civil Procedure 12(b)(6), we take the facts alleged in the complaint as true. *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1247 (9th Cir. 2013).

supplemental services beyond those that will remedy the customers' concerns; write up estimates; and, often, follow up with the customer while the repair work is underway to suggest further repairs and maintenance.

Plaintiffs allege that Defendant has violated the FLSA by failing to pay them overtime wages. The district court dismissed the claim, and Plaintiffs timely appealed.

We reversed. *Navarro v. Encino Motorcars, LLC*, 780 F.3d 1267 (9th Cir. 2015). We held that a regulation promulgated by the Department of Labor in 2011 reasonably interpreted the statutory exemption not to encompass service advisors. *Id.* at 1271–77. Applying the principles of agency deference described in *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), we deferred to the agency's interpretation. *Navarro*, 780 F.3d at 1277.

The Supreme Court granted certiorari and held that we erred by applying the *Chevron* framework. *Encino Motorcars*, 136 S. Ct. at 2124–27. The Court concluded that

> § 213(b)(10)(A) must be construed without placing controlling weight on the Department's 2011 regulation. Because the decision below relied on *Chevron* deference to this regulation, it is appropriate to remand for the Court of Appeals to interpret the statute in the first instance. *Cf. United States v. Mead Corp*, 533 U.S. 218, 238–39 (2001).

*Id.* at 2127 (citation format altered).

## DISCUSSION

Congress enacted the FLSA in 1938 to "protect all covered workers from substandard wages and oppressive working hours." *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). To that end, 29 U.S.C. § 206 imposes a minimum wage requirement, and § 207 requires the payment of overtime compensation for hours exceeding a standard workweek. But not all workers are covered by the Act's provisions. Subsection 213(a) lists categories of employees who are exempt from both the minimum-wage and overtime-compensation requirements. Subsection 213(b) lists categories of employees who are exempt from the overtime-compensation requirement only.

In 1961, Congress amended § 213(a) to exempt from both the minimum-wage and overtime-compensation requirements all employees of automobile dealerships. Fair Labor Standards Amendments of 1961, Pub. L. No. 87-30, § 9, 75 Stat. 65, 71. New paragraph (a)(19) exempted "any employee of a retail or service establishment which is primarily engaged in the business of selling automobiles, trucks, or farm implements." 29 U.S.C. § 213(a)(19) (1961); 75 Stat. at 71.

In 1966, Congress repealed § 213(a)(19) but added paragraph (b)(10). Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, § 208, 80 Stat. 830, 836. The new provision exempted only the following employees from the overtime-compensation requirement:

> any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trailers, trucks, farm

implements, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers.

29 U.S.C. § 213(b)(10) (1966). In effect, unless a separate exemption applied, the 1966 amendments narrowed the 1961 exemption and required dealerships to pay a minimum wage to all employees and to pay overtime compensation to all employees except those listed in § 213(b)(10).

In 1970, the Department of Labor issued a regulation defining the terms of § 213(b)(10). 29 C.F.R. § 779.372. The agency defined "salesman" to encompass only those salesmen who sold vehicles. *Id.* § 779.372(c)(1). Under the agency's interpretation, the exemption did not encompass service advisors. *Id.*; *see also id.* § 779.372(c)(4) (1970).

In 1974, Congress amended § 213(b)(10) to its present-day form to exclude from the overtime-compensation requirement the following employees:

> (A) any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers; or

> (B) any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the

business of selling trailers, boats, or aircraft to
ultimate purchasers[.]

29 U.S.C. § 213(b)(10) (2016); Fair Labor Standards
Amendments of 1974, Pub. L. No. 93-259, § 14, 88 Stat. 55,
61. The 1974 amendments had no effect on the text pertinent
to car dealerships—the same exemptions as in 1966
continued to apply.

In 1978, the Department of Labor issued an opinion letter
stating that, contrary to the agency's regulation, service
advisors were exempt under 29 U.S.C. § 213(b)(10)(A).
Dep't of Labor, Wage & Hour Div., Opinion Letter No. 1520
(WH–467), 1978 WL 51403 (July 28, 1978). In 1987, the
agency amended its Field Operations Handbook along the
same lines, stating in an Insert that the agency would "no
longer deny the [overtime] exemption" for service advisors.
Dep't of Labor, Wage & Hour Div., Field Operations
Handbook, Insert No. 1757, 24L04–4(k) (Oct. 20, 1987).

In 2008, the Department of Labor proposed to amend its
formal regulation—which had remained the same since 1970
despite the agency's shift in position—to conform to its
practice of allowing the exemption for service advisors.
Updating Regulations Issued Under the Fair Labor Standards
Act, 73 Fed. Reg. 43,654-01 (July 28, 2008). After receiving
public comments, however, the agency issued a final rule in
2011 that reaffirmed the agency's original position: service
advisors are not exempt under 29 U.S.C. § 213(b)(10)(A).
76 Fed. Reg. 18,832-01 (Apr. 5, 2011).[2]

---

[2] The Secretary of Labor has informed us that, also in 2011, the
agency amended its Field Operations Handbook by removing the 1987

The parties dispute whether we owe deference to the Secretary of Labor's interpretation that the statute does not exempt service advisors. Plaintiffs argue that deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), is appropriate. Defendant urges us to give no weight to the agency's interpretation. We decline to resolve this dispute because, as we explain below, the answer does not affect the outcome. Instead, we assume without deciding that we must give no weight to the agency's interpretation and the regulation, and we "interpret the statute in the first instance."[3] *Encino Motorcars*, 136 S. Ct. at 2127.

The FLSA exempts from the overtime-compensation requirement "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers." 29 U.S.C. § 213(b)(10)(A). Defendant is an automobile dealership within the meaning of the exemption. We limit our discussion to the exemption's coverage of employees of an automobile dealership. Thus, the relevant statutory passage is: "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles."

---

Insert, thus reverting to its original enforcement practice. Brief for Sec'y of Labor as Amicus Curiae Supporting Plaintiffs-Appellants at 5 n.1.

[3] We do so out of an abundance of caution. If we have misunderstood the Court's instructions and are permitted or required to consider *Skidmore* deference, then we conclude that such deference is appropriate. Although the agency held a contrary position in intervening years, we find the agency's present reasoning persuasive and thorough. Moreover, the agency's current position is identical to the position that it took in 1970—shortly after enactment of the 1966 amendments.

Unless defined by the FLSA, we consider the "ordinary, contemporary, common meaning" of the terms at the time that Congress added the relevant clause—1966. *Perrin v. United States*, 444 U.S. 37, 42 (1979). To determine the common meaning, we consult dictionaries and other sources in use in 1966. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002–04 (2012). For an understanding of job descriptions, we look to the 1966–1967 edition of the Department of Labor, Bureau of Statistics, Occupational Outlook Handbook ("OOH"). *See, e.g.*, *United States v. Charles*, 722 F.3d 1319, 1324 (11th Cir. 2013) (consulting the Occupational Outlook Handbook).

We proceed as follows. First, we conclude that, under the most natural reading of the statute, Congress did not intend to exempt service advisors. Second, even if the text were ambiguous, the legislative history confirms that Congress intended to exempt only salesmen selling cars, partsmen servicing cars, and mechanics servicing cars. Congress did not intend to exempt service advisors.

A. *Statutory Text*

1. *"Any Salesman, Partsman, or Mechanic"*

In 1966, Congress repealed the exemption for *all employees* of an automobile dealership and replaced it with a limited exemption for only *three specific vocations*: salesmen, partsmen, and mechanics. Then, as today, many different types of employees—including service advisors—worked at automobile dealerships. The Occupational Outlook Handbook listed many common vocations. Among those categories of workers that one might have expected to find at automobile dealerships in 1966, three job titles—emphasized

below—clearly align with the three job titles exempted by Congress:

• Automobile body repairmen

• **Automobile mechanics**

• Automobile painters

• **Automobile parts countermen**

• **Automobile salesmen**

• Automobile service advisors

• Automobile upholsterers

• Bookkeeping workers

• Cashiers

• Janitors

• Purchasing agents

• Shipping and receiving clerks

OOH at XIII–XVIII (Table of Contents).

Hence, looking only at the statutory exemption's list of job titles, service advisors were excluded. Congress' choice to exempt three—not four—job titles suggests that service advisors are not exempt. If, as Defendant posits, Congress intended to exempt service advisors, it could have included

"service advisors" in the statutory list.  In sum, the most natural reading of the exemption is that Congress exempted only three commonly understood job titles—automobile salesmen, partsmen, and mechanics—and Congress therefore excluded service advisors.

It is possible to read the exemption's list of job titles more broadly, to encompass all persons whose functional roles meet the dictionary definitions of the terms "salesman," "partsman," or "mechanic."**[4]**  A service advisor can be considered to sell services.  Accordingly, if we read the exemption's list of job titles broadly, a service advisor qualifies, in a generic sense, as a "salesman."**[5]**

But even assuming that Congress intended a broad interpretation of the term "salesman," not every "salesman"

---

**[4]** We give the term "any" no significance.  The term "any" "do[es] not broaden the ordinary meaning" of the word it modifies.  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 93 (2006).  That principle applies with special force here.  Both before and after the 1966 amendments to the FLSA, each of the 33 exemptions in § 213(a) and § 213(b) began with the term "any." *See* 29 U.S.C. § 213(a)(1)–(22) (1965) (beginning with "any"); *id.* § 213(b)(1)–(11) (1965) (same); *id.* § 213(a)(1)–(14) (1967) (same); *id.* § 213(b)(1)–(19) (1967) (same).  The word "any" was plainly a drafting convention, not an expression of congressional intent that we interpret a particular exemption expansively.

**[5]** *See* Random House Dictionary of the English Language ("Random House") 1262 (1966) (defining "salesman" as "a man who sells goods, services, etc."); Webster's Third New International Dictionary ("Webster's Third") 2003 (1965) ("one employed to sell goods or services either within a given territory or in a store"); 9 Oxford English Dictionary ("OED") 50 (1933) ("A man whose business it is to sell goods or conduct sales"); *see also* American Heritage Dictionary of the English Language ("American Heritage") 1144 (1st ed. 1969) ("A man employed to sell merchandise in a store or in a designated territory").

is exempt; the statute covers only those who are "primarily engaged in selling or servicing automobiles."   29 U.S.C. § 213(b)(10)(A).  We therefore consider next whether service advisors primarily engage in selling or servicing cars.

2. *"Primarily Engaged in Selling or Servicing Automobiles"*

A service advisor clearly is not a "salesman . . . primarily engaged in selling . . . automobiles."   That category encompasses salesmen selling a particular good—cars.  It does not cover salesmen selling other goods and, critically, it does not cover salesmen selling services.  Service advisors may be salesmen of a sort, but they do not qualify as salesmen primarily engaged in selling cars because they do not sell cars.

We turn, then, to whether service advisors are "primarily engaged in . . . servicing automobiles."  We begin with the contemporary meaning, in 1966, of the statute's terms. "Primarily" means "essentially; mostly; chiefly; principally."[6] "To be engaged in" an activity means "to occupy oneself; become involved" in the activity.[7]   In the context of an automobile dealership, to "service" means to "supply[]

---

[6] Random House at 1142; *accord* 8 OED at 1358 ("In the first place, first of all, pre-eminently, chiefly, principally; essentially."); *see also* American Heritage at 1039 ("Chiefly; principally").

[7] Random House at 473; *accord* 8 OED at 174 ("to enter upon or employ oneself in an action"); Webster's Third at 751 ("to employ or involve oneself"; "to take part"); *see also* American Heritage at 433 ("To involve oneself or become occupied; participate").

maintenance and repair."**[8]** Thus, to be "primarily engaged in . . . servicing automobiles" means to "occupy oneself principally in maintaining and repairing cars."

Whether we look to the contemporaneous dictionary definitions or to the terms of the phrase itself, the phrase most naturally encompasses only those who are actually occupied in the repair and maintenance of cars—the partsmen and mechanics who, for example, repair defective brakes or flush the transmission. A service advisor neither performs any repairs nor provides any maintenance. Instead, a service advisor "wait[s] on customers who bring their automobiles in for maintenance and repairs." OOH at 314. The service advisor "confers with the customer to determine his service needs, and arranges for a mechanic to do the work." *Id.* Accordingly, service advisors are not primarily engaged in servicing automobiles.**[9]**

Defendant suggests that we adopt a more expansive definition, one that encompasses all employees who are "integral" to the customer's overall experience of having a car serviced. Supp. Brief for Defendant-Appellee at 14 (filed Aug. 16, 2016). The statutory text is arguably flexible enough to accommodate Defendant's suggestion. Using the dictionary definitions most favorable to Defendant, the exemption encompasses those principally "involved" in

---

**[8]** Random House at 1304; *accord* Webster's Third at 2075 ("to repair or provide maintenance for"); *see also* American Heritage at 1185 ("To make fit for use; adjust; repair; maintain").

**[9]** Service advisors may occasionally perform simple repairs or maintenance tasks before the mechanic takes over. But Defendant does not contend that Plaintiffs spend a significant amount of time on those minor tasks.

"supplying maintenance and repair." If one interprets "supplying" to mean "the overall process of supplying," then service advisors can be said, in a general sense, to be "primarily engaged in . . . servicing automobiles."

But the fact "[t]hat a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi*, 132 S. Ct. at 2003. Defendant's interpretation represents a considerable stretch of the ordinary meaning of the statute's words. We usually do not say that we primarily engage in an activity that we do not perform personally (and that we may lack the skills to perform). We typically say that we primarily engage in an activity only if we actually undertake the activity, at least in part. For example, a receptionist-scheduler at a dental office fields calls from patients, matching their needs (e.g., a broken tooth or jaw pain) with the appropriate provider, appointment time, and length of anticipated service. That work is integral to a patient's obtaining dental services, but we would not say that the receptionist-scheduler is "primarily engaged in" cleaning teeth or installing crowns. Similarly, an automobile salesman who sells custom-made cars is integral to a purchaser's receiving a specialized car, but we ordinarily would not say that the salesman is primarily engaged in manufacturing cars.

Defendant nevertheless asserts that we must adopt its broad definition because a narrower interpretation would read "partsman" out of the statute. Defendant contends that, because partsmen do not actually perform the repairs and maintenance, Congress must have intended to include all employees involved in the overall process of providing repair and maintenance services. We are unpersuaded.

The Occupational Outlook Handbook described the position of an "automobile parts counterman" who is employed by automobile dealers.  OOH at 312–14.  Parts countermen may spend some time selling parts to customers. *Id.* at 312.  But parts countermen "employed by automobile and truck dealers . . . may spend most of their time supplying parts to mechanics employed by the dealer."  *Id.*; *see also* Brief for Int'l Ass'n of Machinists and Aerospace Workers as Amicus Curiae Supporting Respondents in *Encino Motorcars*, 2016 WL 1388060, at *28 ("A partsman generally works at one of two counters:  the back counter, which opens to the shop where the mechanics work or the front counter, which opens into the dealership to an area where customers may purchase accessories or parts that will not be installed by the dealership.").  "By knowing how to use parts catalogs and by knowing the layout of the stockroom, he can readily find any one of several thousand items."  OOH at 312.  A parts counterman also uses specialized equipment to test parts, to determine interchangeability of parts, and to repair parts.  *Id.* at 312–13.

Accordingly, Defendant's premise is wrong:  Partsmen "may repair parts, using equipment such as brake riveting machines, brake drum lathes, valve refacers, and engine head grinders."  OOH at 313.  Under any definition, fixing a defective part qualifies as servicing a car.  Partsmen also "may use micrometers, calipers, fan-belt measurers, and other devices to measure parts for interchangeability.  They may also use coil-condenser testers, spark plug testers, and other types of testing equipment to determine whether parts are defective."  *Id.* at 312–13.  Those hands-on tasks are qualitatively indistinguishable from—if not identical to—the work of a mechanic.  Similarly, partsmen use their expert knowledge of parts, parts catalogs, and the stockroom to

determine an appropriate replacement part and locate it for a mechanic—tasks that contribute directly to the actual repair of a car. Because most of the common tasks of a partsman easily meet the ordinary meaning of primarily engaging in servicing, we are not compelled to accept Defendant's broad interpretation of the exemption.[10]

In sum, we conclude that the phrase "primarily engaged in selling . . . automobiles" encompasses only those who are actually and primarily occupied in selling cars, and we conclude that the phrase "primarily engaged in . . . servicing automobiles" encompasses only those who are actually and primarily occupied in the repair and maintenance of cars. Because service advisors meet neither definition, the FLSA does not exempt service advisors.

Our interpretive task could end here, with the words of the statute as commonly understood in 1966. But, to ensure that we have not overlooked a relevant way of reading § 213(b)(10)(A), we will examine that provision in light of applicable principles of statutory construction.

### 3. *Principles of Statutory Interpretation*

Our interpretation comports with a holistic reading of the statutory exemption. *See, e.g.*, *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290

---

[10] It is true, of course, that partsmen may spend some time on tasks unrelated to the servicing of an automobile: They may clean the stockroom, or they may sell parts to the public, for example. But that fact poses no interpretive problem because the exemption covers only those who "primarily" service cars. If an individual partsman spends little time servicing cars, the exemption does not apply.

(2010) ("Courts have a duty to construe statutes, not isolated provisions." (internal quotation marks omitted)); *see also Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context . . . " (internal quotation marks omitted)).  Read literally, the exemption encompasses six categories of employees:

| Salesman primarily engaged in selling | Partsman primarily engaged in selling | Mechanic primarily engaged in selling |
|---|---|---|
| Salesman primarily engaged in servicing | Partsman primarily engaged in servicing | Mechanic primarily engaged in servicing |

Three of the literal categories describe common employees at a dealership:  salesmen selling cars, partsmen servicing cars, and mechanics servicing cars.  A "salesman . . . primarily engaged in selling . . . automobiles" neatly describes a car salesman.[11]  As noted above, many parts countermen likely qualify as "partsm[e]n . . . primarily engaged in . . . servicing automobiles."  And it is unassailable

---

[11] "Automobile salesmen" were "important links between the makers and buyers of new cars, and between used car dealers and buyers."  OOH at 309.  "The automobile salesman spends much of his time waiting on customers," trying to make a sale.  *Id.* at 310.

that most (if not all) automobile mechanics service cars.[12] The remaining three literal categories are: a "salesman . . . primarily engaged in . . . servicing automobiles," a "partsman . . . primarily engaged in selling . . . automobiles," and a "mechanic primarily engaged in selling . . . automobiles." Reading the exemption as a whole, we conclude that Congress did not intend to give meaning to those categories.

A salesman is naturally understood to be someone primarily engaged in selling. After all, he is a *sales*man, defined at the relevant time as "a man who *sells*." Random House at 1262 (emphasis added). It makes little sense, in ordinary speech, to describe a salesman who *primarily* engages in work activities *other than selling*.

Moreover, we know that Congress did not intend for us to give effect to all six literal categories. Read literally, the statute exempts partsmen and mechanics primarily engaged in selling cars, but those categories do not exist in the real world. Neither partsmen nor mechanics occupy themselves regularly, let alone most of the time, with selling cars. By definition, they spend most of their time repairing cars, maintaining cars, repairing parts, determining interchangeability of parts, finding suitable replacement parts in the stockroom, and so on. Congress indisputably did not intend to connect "partsman" and "mechanic" with "selling" automobiles; Congress intended to connect "partsman" and "mechanic" *only* with "servicing" automobiles.

---

[12] "Automobile mechanics keep the Nation's rising number of automobiles . . . in good running order. They do preventative maintenance, diagnose breakdowns, and make repairs." OOH at 477.

Putting it all together, the most natural reading of the statute is that Congress intended the gerunds—selling and servicing—to be distributed to their appropriate subjects—salesman, partsman, and mechanic. A salesman sells; a partsman services; and a mechanic services.

At first blush, it may seem odd for Congress to choose phrasing that, read literally, joins nouns with inapplicable verbs. But Congress sometimes makes that choice. *See, e.g.*, 16 U.S.C. § 742c(e) (referring to "the construction or repair of vessels lost, destroyed, or damaged" by an earthquake); *see also* Brief for Respondents in *Encino Motorcars*, 2016 WL 1298032, app. D (listing scores of statutory phrases using this distributive construction). Scholars and courts have recognized this method of distributive phrasing: "Where a sentence contains several antecedents and several consequents, courts read them distributively and apply the words to the subjects which, by context, they seem most properly to relate." 2A Norman Singer et al., Sutherland Statutes and Statutory Construction § 47:26 (7th ed. Supp. Nov. 2016); *see id.* at n.1 (collecting cases); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 214 (2012) ("Distributive phrasing applies each expression to its appropriate referent."); *id.* at 214–16 (describing cases that applied the principle).

The most natural reading of these statutes is not that Congress wanted to give legal effect to each literal category. Rather, Congress merely used expedient wording to avoid tedious repetition of surrounding text, with the expectation that courts would read the statutes sensibly. This statute provides a good example. Congress could have separated out the treatment of salesmen from the treatment of partsmen and mechanics. But that would have required repeating the

"primarily engaged in" text, the list of vehicles—
"automobiles, trailers, trucks, farm implements, or aircraft"—
and the clause concerning employment at a dealership—"if
employed by a nonmanufacturing establishment primarily
engaged in the business of selling such vehicles to ultimate
purchasers."   29 U.S.C.  §  213(b)(10) (1966).   Instead,
Congress trusted courts to recognize the obvious:  Congress
meant to exempt salesmen selling, not repairing, cars; and
Congress meant to exempt partsmen and mechanics repairing,
not selling, cars.   Thus, the statute leaves only three
categories of exempt employees:[13]

| Salesman primarily engaged in selling | ~~Partsman primarily engaged in selling~~ | ~~Mechanic primarily engaged in selling~~ |
|---|---|---|
| ~~Salesman primarily engaged in servicing~~ | Partsman primarily engaged in servicing | Mechanic primarily engaged in servicing |

### 4.  *Narrow Construction of the FLSA's Exemptions*

We find Defendant's expansive interpretation particularly
implausible in light of the longstanding rule that the
exemptions in § 213 of the FLSA "are to be narrowly
construed against the employers seeking to assert them."

---

[13] We address here only automobile dealerships.  There is some
suggestion in the legislative history that partsmen employed by farm-
implement dealers were understood to sell farm implements.  But we have
found no suggestion—in the legislative history or otherwise—that
automobile partsmen sell cars.

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *accord Mitchell v. Ky. Fin. Co.*, 359 U.S. 290, 295 (1959) (holding that the principle of narrow construction of the FLSA's exemptions is "well settled"). We must apply exemptions only to "those [employees] plainly and unmistakably within [the FLSA's] terms." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945). In order to conclude that § 213(b)(10)(A) encompasses service advisors, we would be required to do the opposite—construe the exemption broadly. We are bound by Supreme Court precedent to construe the exemption narrowly.

In recent years, the Supreme Court has acknowledged the rule of narrow construction with respect to the exemptions listed in § 213, but the Court has held that the rule does not apply to interpretations of other provisions of the FLSA, such as the general definitions codified in § 203. *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 879 n.7 (2014); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2172 n.21 (2012). Because this case involves interpretation of terms appearing in § 213 and not defined in § 203, the Supreme Court's longstanding principle of narrow construction applies here. We recognize that some members of the Supreme Court have questioned the soundness of the rule of narrow construction. *E.g.*, *Encino Motorcars*, 136 S. Ct. at 2131 (Thomas, J., dissenting). But we may not disregard the Court's existing, binding precedent. *See, e.g.*, *Bosse v. Oklahoma*, 137 S. Ct. 1, 1 (2016) (per curiam) ("It is this Court's prerogative alone to overrule one of its precedents." (internal quotation marks and brackets omitted)); *id.* ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have

raised doubts about their continuing vitality." (internal quotation marks omitted)).[14]

In sum, we are convinced that Congress intended to exempt only salesmen selling cars, partsmen servicing cars, and mechanics servicing cars. We agree with Defendant that, under an expansive interpretation of the literal category of a "salesman . . . primarily engaged in . . . servicing automobiles," the statute could be construed as exempting service advisors. But in light of the ordinary meaning of the exemption's words and the rule that we must interpret exemptions narrowly, we find that interpretation implausible. We nevertheless assume that Defendant's interpretation creates an ambiguity. Accordingly, we examine legislative history below.

B. *Legislative History*

As we have noted, in 1966, Congress enacted new § 213(b)(10), exempting from the overtime-compensation requirement "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles" at a dealership. During hearings before subcommittees of the House and the Senate, the National Automobile Dealership Association had sought an overtime exemption for two specific categories of

---

[14] For the sake of judicial economy, we note that we would reach the same ultimate holding—that the exemption does not encompass service advisors—even if the rule of narrow construction did not apply. Defendant's interpretation creates, at most, an ambiguity. Because legislative history strongly suggests that Congress did not intend to exempt service advisors, our ultimate holding is the same, whether or not we apply the principle of narrow construction.

employees:    automobile salesmen and mechanics.[15]
According to the Association, automobile salesmen and
mechanics were well paid, and they often worked unusual
hours; accordingly, overtime compensation would be both
unnecessary and challenging to calculate.    *1965 House
Hearings* at 368–69; *1965 Senate Hearings* at 1237–38. The
testimony was not new.  The Association had given similar
testimony in 1961, 1960, 1959, and 1957,[16] in response to

---

[15] *Minimum Wage-Hour Amendments:  Hearings on H.R. 8259 Before
the Gen. Subcomm. on Labor of the H. Comm. on Educ. & Labor*, 89th
Cong. 366–77 (1965) ("*1965 House Hearings*") (statement of Sam H.
White, Chairman, Govt'l Relations Comm., Nat'l Auto. Dealers Ass'n);
*Amendments to the Fair Labor Standards Act:  Hearings on S. 763 et al.
Before the Subcomm. on Labor of the S. Comm. on Labor & Pub. Welfare*,
89th Cong. 1236–38 (1965) ("*1965 Senate Hearings*") (statement of Sam
H. White, Chairman, Govt'l Relations Comm., Nat'l Auto. Dealers
Ass'n).

[16] *Amendments to the Fair Labor Standards Act:  Hearings on S. 256
et al. Before the Subcomm. on Labor of the S. Comm. on Labor & Pub.
Welfare*, 87th Cong. 175–82 (1961) (statement of S.E. Kossman,
Chairman, Nat'l Affairs Comm., Nat'l Auto. Dealers Ass'n); *Minimum
Wage-Hour Legislation:  Hearings Before the Subcomm. on Labor
Standards of the H. Comm. on Educ. & Labor*, 86th Cong. 1391–94
(1960) ("*1960 House Hearings*") (statement of William J. Cleveland,
Director, Nat'l Auto. Dealers Ass'n); *To Amend the Fair Labor Standards
Act:  Hearings on S. 25 et al. Before the Subcomm. on Labor of the S.
Comm. on Labor & Pub. Welfare* , 86th Cong. 205–14 (1959) ("*1959
Senate Hearings*") (statement of William J. Cleveland, Nat'l Auto.
Dealers Ass'n); *Fair Labor Standards Act:  Hearings Before a Subcomm.
of the H. Comm. on Educ. & Labor*, 85th Cong. 251–77 (1957) ("*1957
House Hearings*") (statement of Frederick M. Sutter, President, Nat'l
Auto. Dealers Ass'n); *Proposals to Extend Coverage of Minimum Wage
Protection:  Hearings on S. 1135 et al. Before the Subcomm. on Labor of
the S. Comm. on Labor & Pub. Welfare*, 85th Cong. 113–33 (1957) ("*1957
Senate Hearings*") (statement of Frederick J. Bell, Rear Admiral USN
(Ret.), Executive Vice President, Nat'l Auto. Dealers Ass'n); *see also id.*

earlier proposals for the FLSA to cover dealerships' employees.  In sum, when the full Congress took up the proposal, the automobile-dealership industry had made clear its concerns about applying the overtime-compensation requirement to two specific categories of employees: automobile salesmen and mechanics.

The legislative history contains only one probative discussion by members of Congress:  a debate in the Senate about whether to exempt partsmen in addition to automobile salesmen and mechanics.  112 Cong. Rec. 20,502–06 (1966). Everyone agreed that automobile salesmen[17] and mechanics work irregular hours, sometimes away from the dealership. *See, e.g.*, *id.* at 20,504 ("Salesmen are a little different breed of cats, because they go out at unusual hours . . . ." (statement

---

at 1160–61 (letter dated Mar. 29, 1957, from the South Carolina Automobile Dealers Association, expressing similar sentiments).

[17] Notably, the Senators implicitly assumed that "salesman" referred to someone who sells cars.  *See* 112 Cong. Rec. 20,504 ("[An amendment] would not affect the salesman.  He can go out and sell an Oldsmobile, a Pontiac, or a Buick all day long and all night.  He is not under any overtime." (statement of Sen. Yarborough)); *id.* ("The salesman tries to get people mainly after their hours of work.  In some cases a man will leave his job, get his wife, and go to look at automobiles." (statement of Sen. Yarborough)); *id.* ("Salesmen . . . go out at unusual hours, trying to earn commissions." (statement of Sen. Bayh)).  One commentator has interpreted a passage by Senator Javits as implicitly mentioning service advisors as a form of salesman.  Note, *Show Me the Money:  On Whether Car Dealership Service Advisors Are Entitled to or Exempt From Overtime Pay Under the FLSA*, 91 Notre Dame L. Rev. 1707, 1731 (Apr. 2016).  We draw the opposite inference from the transcript.  Senator Javits noted that "the mechanic and the salesman [are] subject to call at any time that a fellow's car broke down."  112 Cong. Rec. 20,506.  We read that comment to mean simply that, when one's car fails, there are two options—fix it (via a mechanic) or replace it (via a car salesman).

of Sen. Bayh)); *id.* ("My experience with automobiles has been that the mechanic goes out and answers calls in the rural areas." (statement of Sen. Yarborough)). The debate centered on whether the same was true of partsmen. Some Senators thought that partsmen had to work irregular hours and, accordingly, should also be exempt. *See, e.g.*, *id.* at 20,502 ("In many instances it is essential that partsmen work longer hours or at other than regular times. This is especially true in the farm equipment business . . . . Because of these factors, it would not be easy to place partsmen on a time-clock basis and to compute overtime compensation in an equitable manner." (statement of Sen. Bayh)); *id.* at 20,503 ("The partsman does occupy a significant and unusual position in the agricultural economy. He has to be available during the harvesting season—and before and after, to a lesser extent—at all hours of the day." (statement of Sen. Mansfield)). Other Senators thought that partsmen worked inside only and, accordingly, like all other ordinary employees of a dealership, should not be exempt. *See id.* at 20,504 ("The mechanics and the salesmen . . . do not get overtime because their work is outside. . . . The partsman works inside." (statement of Sen. Yarborough)); *id.* ("[A] partsman is an inside man. The reason for exempting the salesmen and the mechanics was the difficulty of their keeping regular hours." (statement of Sen. Yarborough)); *id.* at 20,505 ("[T]here is no excuse whatever for including partsmen in the overtime exemption, because the partsman, like the stenographer, would be working inside." (statement of Sen. Clark)). Nothing in the legislative record suggests that Congress thought that service advisors worked anything but ordinary business hours—to the extent that Congress thought about service advisors at all. *See* OOH at 314–17 (describing the work of service advisors without anywhere suggesting that they worked unusual hours).

The legislative history thus contains repeated, detailed concerns about applying the overtime-compensation requirement to automobile salesmen, partsmen, and mechanics. By contrast, Defendant does not direct us to any portion of the legislative history that reveals a similar concern for applying the overtime-compensation requirement to service advisors, and we have found none. To the contrary, the only references to service advisors that we have found suggest that dealerships had no concern about overtime compensation for service advisors.[18]

Viewed in light of the clear concerns about overtime compensation for automobile salesmen, partsmen, and mechanics, the legislative history's apparent silence on concerns about overtime pay for service advisors strongly suggests that Congress did not intend to exempt service advisors. If Congress meant for the exemption to encompass service advisors, we would expect that concern to be plain from—or at least mentioned in—the legislative record of the 1966 amendments.

In 1974, Congress amended paragraph (b)(10) to its present-day form. 29 U.S.C. § 213(b)(10) (2016); 88 Stat. at 61. The law created new subparagraph (b)(10)(A), which exempted "any salesman, partsman, or mechanic primarily

---

[18] *See 1960 House Hearings* at 1393 (testimony by a Ford dealer from rural Louisiana, merely comparing the average pay at his dealership with the average pay at dealerships in New Orleans for mechanics, painters, body repairmen, upholsterers, parts-department men, and "service salesmen [service advisors]"); *1959 Senate Hearings* at 208 (same); *1957 House Hearings* at 1188 (same); *1957 Senate Hearings* at 1160–61 (letter from the South Carolina Auto. Dealership Ass'n expressing no concern about paying overtime to its employees other than automobile salesmen and mechanics).

engaged in selling or servicing automobiles, trucks, farm implements" and new subparagraph (b)(10)(B), which exempted "any salesman primarily engaged in selling trailers, boats, or aircraft."

Both the House and the Senate were provided with written summaries of the revised exemption. In the House, Representative Dent's report described the overall effect of the new § 213(b)(10)(A) & (B):

> Provides an overtime exemption for *any salesmen primarily engaged in selling automobiles*, trailers, trucks, farm implements, boats, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers. Also provides an overtime exemption for partsmen and mechanics of automobile, truck, and farm implement dealerships.

120 Cong. Rec. 8602 (1974) (emphasis added). That summary makes clear that "salesman" applies *only* to "selling" goods. There is no mention of salesmen primarily engaged in servicing automobiles, even though the literal terms of the exemption could encompass that category. Instead, the summary applied only the verb "selling" to the subject "salesman."

In the Senate, Senator Williams' report described the changes between the then-existing exemption and the new § 213(b)(10)(A) & (B):

[A]mends section 13(b)(10) relating to salesmen, partsmen, and mechanics by repealing the overtime exemption for partsmen and mechanics in nonmanufacturing establishments primarily engaged in selling trailers; by repealing the overtime exemption for partsmen and mechanics in nonmanufacturing establishments engaged in selling aircraft; and by providing an overtime exemption for salesmen engaged in the sale of boats.

120 Cong. Rec. 8763 (1974). That summary also makes clear that "salesman" applies *only* to "selling" goods. Reviewing the words of the statute literally, as Defendant urges us to do, the amendment also repealed the exemption for salesmen primarily engaged in servicing trailers and aircraft. But the summary does not mention such an effect, strongly suggesting that Congress did not think that "salesman" connected to "servicing." Thus, the summaries of the 1974 amendments before the House and the Senate both understood the exemption to encompass only salesmen "selling," not salesmen "servicing."

So, too, did the National Automobile Dealers Association. During hearings before subcommittees of the House and the Senate, the Association submitted a prepared statement that urged Congress not to change § 213(b)(10) as it applied to salesmen, partsmen, and mechanics at automobile dealerships.[19] The statement explained that Congress' 1966

---

[19] *To Amend the Fair Labor Standards Act: Hearings on H.R. 10948 and H.R. 17596 Before the Gen. Subcomm. on Labor of the H. Comm. on Educ. & Labor*, 91st Cong. 109–11, 259–61 (1970) ("*1970 House*

creation of the exemption in § 213(b)(1) "was a recognition of the fact that these categories of employees work long hours during peak periods, but receive high commissions, and, accordingly should not be subject to overtime requirements." *1970 House Hearings* at 109, 259.  To prove the high-pay assertion, the statement then detailed the average earnings of "*all car and truck* salesmen," "mechanics," and "partsmen." *Id.* (emphasis added).  To prove that salesmen, mechanics, and partsmen work long hours, the statement described each position.  The paragraph describing salesmen plainly refers to persons who sell cars, not to service advisors.  *Id.*  The statement summarized:

> The primary purpose of minimum wage and overtime legislation is to take care of people who receive substandard salaries.  As already noted, *automobile salesmen* average $10,036 per year, automobile mechanics average $5.00 per hour and partsmen average $3.42 per hour.

*Id.* (emphasis added).

As with the 1966 amendments, Defendant has not pointed us to any passage of the legislative history suggesting that Congress intended to exempt service advisors, and we have found none.  To the contrary, the only reference to service

---

Hearings"); *Fair Labor Standards Amendments of 1971:  Hearings on S. 1861 and S. 2259 Before the Subcomm. on Labor of the Senate Comm. on Labor & Pub. Welfare*, 92nd Cong. 789–94 (1971) ("*1971 Senate Hearings*").

advisors that we have found suggests that Congress had no concern about overtime compensation for service advisors.[20]

In sum, the legislative history of the 1966 amendments and of the 1974 amendments reveal clear concerns with applying the overtime-compensation requirement to exactly three categories of a dealership's employees: automobile salesmen, partsmen, and mechanics. The extensive legislative record—tens of thousands of pages spanning a decade and a half—contains hardly a mention of service advisors, and the few references that exist display no concern about overtime compensation for service advisors. We are firmly persuaded that Congress did not intend to exempt service advisors.

C. *Conclusion*

After a thorough, de novo review of congressional intent, we hold that the exemption in § 213(b)(10)(A) does not encompass service advisors. We acknowledge that our holding conflicts with published decisions by the Fourth and Fifth Circuits and by the Supreme Court of Montana. *Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446 (4th Cir. 2004); *Brennan v. Deel Motors, Inc.*, 475 F.2d 1095 (5th Cir. 1973); *Thompson v. J.C. Billion, Inc.*, 294 P.3d 397 (Mont. 2013). We are unpersuaded by the analysis of those decisions for the reasons stated above and for the reasons stated in our earlier opinion (except those reasons concerning deference to the agency). *Navarro*, 780 F.3d at 1274–77.

---

[20] We found only one portion of the legislative record that mentions a "service adviser." *1971 Senate Hearings* at 780–81. That testimony merely described what a service advisor does; it does not suggest that the exemption applied to service advisors. *Id.*

This opinion addresses only Plaintiffs' federal claim for overtime compensation.  For the reasons given in our earlier opinion, *id.* at 1270 n.2, we affirm the dismissal of all other federal claims, and we reverse the dismissal of the state-law claims.

**AFFIRMED in part, REVERSED in part, and REMANDED.**  Costs on appeal awarded to Plaintiffs-Appellants.